**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240707-U

Order filed March 27, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0707 Circuit No. 24-CF-692 |
| THOMAS B. McDERMOTT, | ) ) ) | Honorable William S. Dickenson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court.
Justice Anderson concurred in the judgment.
Justice Holdridge dissented.

_____

**ORDER**

¶ 1        *Held*:   The trial court did not err in granting the State's verified petition to deny pretrial release.

¶ 2        Defendant, Thomas B. McDermott, appeals from the trial court's granting of the State's verified petition to deny pretrial release. For the reasons set forth below, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4    On October 18, 2024, a grand jury returned an indictment against defendant, Thomas B. McDermott, for two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2020)) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)). The State filed a verified petition to deny pretrial release, alleging defendant was charged with a detainable offense and he posed a real and present threat to the safety of any person, persons, or the community pursuant to section 110-6.1(a)(1.5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-6.1(a)(1.5) (West 2022)).

¶ 5    The initial hearing on the State's detention petition was held on November 6, 2024, wherein the State provided a factual basis as follows. In July 2024, D.G. contacted the police regarding sexual incidents that occurred with defendant, who was her stepfather at the time. D.G. reported that defendant started sexually abusing her in 2020 when she was a sophomore in high school, and it continued into 2023. The first incident occurred when D.G.'s mother had taken one of her brothers to wrestling practice and defendant entered D.G.'s bedroom, began to hug her in bed, and told her to go into the bathroom. D.G. refused and defendant yelled at her and told her she had to listen to him. Defendant entered the bathroom, turned on the shower, and began to undress. D.G. followed defendant into the bathroom, and he made her perform oral sex on him. Afterwards, defendant rubbed body wash all over D.G. On another occasion, defendant took D.G. to visit a college. During the drive, defendant touched D.G.'s thigh. Defendant made D.G. shower with him in the hotel room, he made her consume alcohol, and he performed oral sex on her. D.G. recalled other incidents when her mother was not present and defendant would call her into his bedroom or enter her bedroom. Defendant would have D.G. perform oral sex on him, digitally penetrate her, make her kiss him, and masturbate and ejaculate on her face and chest while she was topless. D.G. approximated these incidents occurred 80 times. D.G. had been involved in therapy and felt ready to speak about what occurred with defendant.

¶ 6          As it relates to threats of violence and physical violence, defendant told D.G. on multiple occasions that if she told her mother, he would kill D.G. When D.G. would confront defendant, he would push and choke her. On other occasions, when defendant was mad at D.G. and her siblings, he would threaten to push them off a balcony.

¶ 7          Defense counsel proffered that defendant was employed as a facilities manager for the tollway. Defendant and D.G.'s mother began living together in 2015, married in 2016, and divorced in 2022. Defendant and D.G.'s mother had one child together, L.M., and there was an ongoing case for parenting time that was mutually filed. Counsel argued D.G. was not credible and noted that defendant did not have a criminal history. Counsel stated, in late 2023, D.G. told her mother about the alleged incidents and her mother confronted defendant. Defendant denied the allegations and threatened to take legal action for defamation if the claims continued. The confrontations stopped. Counsel argued there were no safety issues as to defendant's release because D.G.'s mother knew about the allegations for a year and D.G. continued to attend events where defendant was present. Moreover, the record demonstrated that defendant lived in a different county than where D.G. resided and attended college.

¶ 8          In their respective arguments, both parties referenced D.G.'s videotaped sheriff's interview regarding the alleged abuse as part of their respective proffers. The State urged that D.G.'s account was detailed and credible, while the defense characterized D.G. as vague and unreliable, further informing the court, "upon information and belief," that D.G. had made a previous allegation of a sexual nature against her biological father which she subsequently recanted. Ultimately, both sides asked, and the court agreed, to review D.G.'s videotaped interview to assist in determining if detention was appropriate.

¶ 9        The matter reconvened the next day, where the court made oral and written findings. Commenting on the videotaped interview, the court noted that "[D.G.] continued to be consistent, continued to be specific in detail. Her demeanor appeared to be appropriate. There was nothing about her demeanor that caused me concern." The court then recounted the charges and the statement of D.G. to determine that the charges were detention-eligible offenses supported by clear and convincing evidence. In finding that defendant was a danger to D.G. and that no conditions could mitigate the danger, the court's written order found that defendant "has threatened to kill the victim if she told her mom. He has also pushed her down and choked her. He has been mentally and physically abusive to her ***. Although he kept tell [*sic*] her he would stop he didn't."

¶ 10       The court granted the State's petition, finding by clear and convincing evidence that the presumption was great that defendant committed a detainable offense. The court found defendant was a danger to D.G. and L.M. and no conditions could mitigate the risk of dangerousness because defendant knew what he was doing was wrong, said he was going to stop, but nonetheless persisted. The court also issued a civil no contact order as to D.G., providing that defendant shall stay at least 500 feet away from D.G., prohibited defendant from entering or remaining at D.G.'s residence and college, and ordering that defendant have no contact with D.G.

¶ 11       Defendant moved for release on two more occasions and presented the testimony of Diana Wybourn, operator of Presa LLC, who had provided supervised parenting time in response to court orders prior to defendant's detention in this case. Wybourn testified that a court order limited defendant's visitation with L.M. to three times per week for two hours each time. The order was caused by an allegation that defendant grabbed L.M.'s leg improperly after L.M. fed a dog human food. The State proffered that L.M. was returned to his mother's care with a large bruise on his thigh, and L.M. told his mother that defendant struck him when L.M. dropped a cheeseburger and

4

a dog ate it. Wybourn testified that defendant and L.M. seemed to enjoy their visits. Wybourn stated that D.G. brought L.M. to visitation in September 2024 and did not appear distressed at being in the same building as defendant. The court found defendant's detention remained necessary.

¶ 12        Thereafter, defendant filed a motion for relief, arguing, among other things, that the court erred in finding he posed a danger and that the danger could not be mitigated with conditions. Defendant noted that no criminal violence was alleged to have occurred against D.G. in 2024, none of the family lived with defendant anymore, and neither D.G. nor the rest of the family appeared to have concern for their safety when seeing defendant in public. Following a hearing, the court denied the motion. Defendant appeals.

¶ 13                                    II. ANALYSIS

¶ 14        On appeal, defendant argues the court erred in granting the State's petition. Specifically, defendant contends the court erred in finding he posed a threat that could not be mitigated by conditions. Everyone charged with an offense is eligible for pretrial release, which may only be denied in certain situations. 725 ILCS 5/110-2(a), 110-6.1 (West 2022). The State must file a verified petition requesting the denial of pretrial release. *Id.* § 110-6.1. The State then has the burden of proving by clear and convincing evidence (1) the proof is evident or presumption great that the defendant committed a detainable offense, (2) the defendant poses a real and present threat to any person, persons, or the community or is a flight risk, and (3) no conditions could mitigate this threat or risk of flight. *Id.* § 110-6.1(a), (e). When determining a defendant's dangerousness and the conditions of release, the statute includes a nonexhaustive list of factors the court can consider. *Id.* §§ 110-6.1(g), 110-5; *People v. Mikolaitis*, 2024 IL 130693, ¶ 21. Where the hearing on the State's petition to detain contains no live witness testimony our review is *de novo*. *People*

5

*v. Morgan*, 2025 IL 130626, ¶ 54. When live witness testimony is presented, the court's decision will not be disturbed unless it is against the manifest weight of the evidence.[1] *Id.*

¶ 15 We agree with the court's decision that no conditions could be imposed on defendant to mitigate the risk he poses to D.G. Though the evidence demonstrated defendant had no criminal history and that D.G. resided and attended school in different counties than where defendant resided, the fact remains that defendant had regularly threatened to kill D.G. if she disclosed the abuse. He also choked her on more than one occasion when she tried to stop the abuse. The no contact order entered by the court would do little to prevent defendant from following through on his threat to kill D.G. if indeed this is his intent. For the same reason, defendant's offer to the court to wear a GPS device would not prevent, in real time, defendant's violation of a no contact order. Therefore, neither the court's decision to detain defendant, nor the underlying factual findings supporting its decision, were against the manifest weight of the evidence.

¶ 16 We affirm.

¶ 17 III. CONCLUSION

¶ 18 The judgment of the circuit court of Kankakee County is affirmed.

¶ 19 Affirmed.

¶ 20 JUSTICE HOLDRIDGE, dissenting:

---

[1] D.G.'s videotaped interview, which the court reviewed to assess the credibility of the State's proffer, does not fall neatly into either of the *Morgan* court's standard of review boxes. While, in the literal sense, D.G.'s videotaped interview was not live testimony, what are we to make of the credibility arguments urged by both sides and the parties' request that the court review D.G.'s videotaped interview and assess her credibility? Given this unusual procedural posture and the court's specific credibility findings regarding D.G.'s statement, one might apply the manifest weight of the evidence standard to both the court's factual findings as well as its ultimate decision to detain. Ultimately, however, the standard of review question is academic in that we would affirm the trial court's decision to detain under either the manifest weight or the *de novo* standard.

¶ 21    The majority upholds the decision of the trial court to detain defendant because it found there are no conditions that could be imposed that would mitigate the danger defendant poses to D.G. I disagree and would reverse and remand for the court to determine which conditions to impose and to release the defendant.

¶ 22    As the majority has stated, the evidence demonstrated the defendant had no criminal history, D.G. resided and attended school in different counties than where the defendant resided, and the defendant had a history of compliance with court orders that were in place regarding supervised visitation with L.M. Additionally, when the defendant learned of the charges brought against him and that an arrest warrant had been issued for him in the present matter, he turned himself in to the Kankakee County Sheriff's Office, indicating further his willingness to comply with court orders.

¶ 23    D.G. has stated that defendant had on more than one occasion threatened to kill her if she disclosed the abuse to her mother, and that defendant choked her on more than one occasion when she tried to stop the abuse. Even if this is true, in late 2023, D.G. did tell her mother about the actions of the defendant detailed above, and when the D.G.'s mother confronted defendant about it, defendant did nothing to D.G. in response. In the approximately ten months between defendant learning that D.G. spoke to her mother and being taken into custody on November 4, 2024, defendant attempted no contact with D.G. or gave any indication that he would act out on his prior threats. The passage of time not only showed a reduction of the real and present threat the defendant may have posed, but proved defendant's willingness to abide by court orders and conditions. Had charges been pursued and defendant been taken into custody shortly after learning that D.G. had spoken to her mother, defendant may have then posed a threat that no conditions of release could have mitigated. However, that is not the case here.

7

¶ 24    In *People v. Crawford*, 2024 IL App (3d) 230668, ¶ 10, a pretrial detention case recently before our court, we held that the passage of seven months from the date of the defendant's offense of stalking until charges were brought was sufficient to reduce the threat posed by the defendant. Such a reduction in the threat led us to find that conditions were available to prevent the fulfillment of the threat. *Id*. However, "[h]ad the state pursued charges earlier, the result may have been different." *Id*. I believe this case is analogous to our decision in *Crawford*.

¶ 25    Lastly, there was no allegation or evidence presented that the defendant posed a threat to the community as a whole. Given the evidence before us, under either the *de novo* or manifest weight of the evidence standard, I believe the trial court erred in finding that no conditions could mitigate any threat the defendant posed to D.G., and I would remand for the court to determine which conditions to impose and to release the defendant.

¶ 26    As a final matter, I would point out that whether the defendant is guilty of these offenses is a question that has not yet been resolved. The issue before this court is not the defendant's guilt or innocence but whether he should be detained prior to trial.